**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated:  February 17 2016**

John P. Gustafson
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **In Re:** | ) | **Case No.  15-31428** |
| | ) | |
| Mark O. McVicker | ) | **Chapter 7** |
| Sharon S. McVicker, | ) | |
| | ) | **JUDGE JOHN P. GUSTAFSON** |
| **Debtors.** | | |

## <u>MEMORANDUM OF DECISION RE: HUNTINGTON BANK'S MOTION TO DISMISS CASE UNDER 11 U.S.C. SECTION 707(a)</u>

This cause comes before the court on Huntington Bank's Motion to Dismiss Case Pursuant to 11 U.S.C. §707 and for Extension of the Deadline to Object to Discharge. [Doc. #39 & #40].[1]  The Debtors filed a Memorandum in Opposition to Creditor The Huntington, N.A.'s Motion to Dismiss [Doc. #49], and Huntington Bank filed a Reply to Debtors' Memorandum in Opposition to Motion to Dismiss. [Doc. #51]. An evidentiary hearing was held, at which the Debtors testified.  Most of the underlying facts are not in dispute.

Huntington Bank (hereinafter "Huntington" or "Bank") seeks dismissal of this case based upon the

---

[1]/ The docket reflects that duplicate Motions to Dismiss were filed by Huntington, each 337 pages, with exhibits.  This memorandum will cite to Document #40.

Debtors' conduct in relation to a loan they took out to purchase rental property. In August of 2007, Cutting Edge Rentals, LLC took out a commercial loan in the amount of $175,000, which the Debtors both personally guaranteed. The funds were borrowed to consolidate three loans. The Huntington loan was secured by a mortgage on four rental apartments located at 2612 and 2652 Stitt Street in Toledo, Ohio [the "Stitt Street properties"]. The Stitt Street properties were owned by the Debtors personally. Part of the security for the loan was an assignment of rents in favor of the Bank.[2]

The apartments were rented out to various tenants, and payments on the loan were made, and kept current until November, 2014, a time period of a little more than seven years. In late 2007, the apartment identified as 2652 Stitt Street, Apartment A, was severely damaged by a tenant, and that unit remained uninhabitable through the date of filing. Mr. McVicker testified that he worked on the damaged apartment "as funds were available", with the last work on Apartment A having been done in the Spring or Summer of 2015. After the unit was damaged, Mr. McVicker estimated that he and his wife "were averaging approximately $900 a month out of pocket over and above the rents coming in." [Doc. #40, Pl. Ex. 16, pp. 192-193].

In July of 2009, Debtor Mark McVicker retired[3] from Columbia Gas after working there for 39 years. Mr. McVicker received a year's severance from the company, meaning his income continued unchanged through July of 2010. He started receiving Social Security Disability as of August 1, 2010. In October of 2014, Debtor Sharon McVicker retired from her job as a librarian. The Debtors have additional income of about $850 a month from IRA withdrawals. After Sharon McVicker's retirement, the Debtors testified that they reevaluated their financial situation.

At the time of the Hearing, Mark McVicker was 64 years old. He has been diagnosed with prostate cancer. Sharon McVicker is 61 years old. She testified that she has back problems that makes it difficult to sit or stand for extended periods.

The last payment on the Huntington loan was made in late November or early December of 2014. Mr. McVicker testified that the monthly payments were stopped to get Huntington Bank's attention, because their telephone calls to the bank, seeking to work something out on the loan, were not being

---

[2]/ The loan was actually made by Sky Bank, which later merged with Huntington Bank.

[3]/ Mr. McVicker testified that he felt he was "forced out" by the company. He had taken time off for health reasons, and was not allowed to return to work.

2

returned. At some point, they hired an attorney, Howard Hershman, to represent them in negotiations with Huntington Bank.

Huntington contacted the McVickers after the default, and the parties had some discussions about alternatives to continuing payments on the loan. Mr. McVicker testified that the McVickers obtained at least one "Broker Price Opinion" ["BPO"] on the value of the Stitt Street properties. While he testified that he thought Huntington Bank was going to get their own BPO on the properties, Huntington elected to take a cognovit judgment against the McVickers after the first week of March, 2015. The Common Pleas Court "Order Granting Judgment in Favor of Plaintiff" reflects a filed stamped date of April 3, 2015. [Doc. #40, Ex. 23, p. 295]. The McVickers learned of the judgment when they were served by certified mail.

Mr. McVicker stated that the issuance of the cognovit judgment prompted the McVickers to seek bankruptcy counsel. He also testified that Huntington suggested the McVickers file bankruptcy during the course of negotiations regarding the Huntington commercial loan. The Debtors filed the above captioned Chapter 7 case on May 4, 2015. [Doc. #1].

The amount that remains owing on the loan secured by the apartments is approximately $125,000. [Pl. Ex. 1, Schedule D, p. 14]. Unsecured debts in this case total approximately $2,300, which were primarily obligations for medical and dental services. [*Id.*, at p. 17].

The Debtors have an IRA listed in the amount of $550,255.91, which was funded by a rollover from Mark McVicker's retirement from Columbia Gas. Sharon McVicker scheduled an IRA in the amount of $26,734.14. She also has a State Employees Retirement System pension. [*Id.*, at p. 11].

The Debtors own a home with a first mortgage of approximately $93,000. [*Id.*, at p. 14]. They listed the value of their residence at $200,000, and claimed the equity as exempt under Ohio's homestead exemption, O.R.C. §2329.66(A)(1). [*Id.*, at 13].

Huntington asserts that this case was filed to get rid of one debt - the obligation owed to the bank and guaranteed by the McVickers. It is Huntington's position that the Debtors could have used their retirement savings, or their exempt home equity, to pay the commercial loan, and chose not to. The Bank points out that the McVickers' retirement savings is more than four times the amount of the loan owed to Huntington, [Doc. #40, p. 11, ¶46], and that at the present rate of $850 per month being withdrawn from the retirement accounts, their retirement would last more than 50 years, which exceeds the Debtors expected life span. Huntington asserts that this warrants dismissal of the above captioned Chapter 7 case under 11

3

U.S.C. Section 707(a), because the case is filed in bad faith.

## LAW AND ANALYSIS

Huntington's Motion to Dismiss "for cause" is filed under 11 U.S.C. §707(a), which states:

(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause,

   including—

      (1) unreasonable delay by the debtor that is prejudicial to creditors;

      (2) nonpayment of any fees or charges required under chapter 123 of title 28; and

      (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time
         as the court may allow after the filing of the petition commencing such case, the
          information required by paragraph (1) of section 521(a), but only on a motion by the
United
         States trustee.

While the statute does not specifically state that a Chapter 7 case can be dismissed for lack of good faith under §707(a), controlling Sixth Circuit case law holds that it can.[4] The Sixth Circuit Court of Appeals has stated that "including" is not meant to be a limiting word. *See, Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1126 (6th Cir. 1991); *and cf.*, *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373, 127 S. Ct. 1105, 1110-1111, 166 L. Ed.2d 956, 965-966 (2007)(stating that the nonexclusive list of causes justifying dismissal under §1307© does not mention bad faith but recognizing that dismissal for bad faith is implicitly authorized by the words "for cause" in that section). The *Zick* court examined the case law and

---

[4]/ In other jurisdictions, "Whether a chapter 7 case can be dismissed on bad faith grounds under section 707(a) is one of the older debates in bankruptcy law." *In re Adolph*, 441 B.R. 909, 911 (Bankr. N.D. Ill. 2011). Although *Zick* was decided prior to the 2005 BAPCPA amendments that substantially changed §707(b), courts in the Sixth Circuit (as well as many courts outside the circuit) continue to follow *Zick* . *See e.g.*, *In re Tow*, 2016 WL 74741 at *2, 2016 Bankr. LEXIS 29 at *4-6 (Bankr. N.D. Ohio Jan. 5, 2016). Additional reasons for the continued vitality of *Zick* after the BAPCPA amendments are found in *In re Yim Kealamakia*, 2013 Bankr. LEXIS 2777 at *14-22 (Bankr. D. Utah July 9, 2013)(§707(a) was part of the original Bankruptcy Code, while §707(b) (in its earliest iteration) was not added until the 1984 BAFJA amendments.)

4

was "persuaded that lack of good faith[5] is a basis for dismissal under §707(a) ". *Zick*, 931 F.2d at 1127.

While *Zick* holds that the facts establishing a lack of good faith "are as varied as the number of cases"[6], the decision also sets a high bar for dismissal. The use of §707(a) to dismiss Chapter 7 cases based upon a lack of good faith "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Id*. at 1129. The *Zick* decision also explicitly endorsed the "smell test", which was described as having "particular merit". *Id.* at 1127.

As the moving party, Huntington bears the burden of proving "cause" under §707(a). *Simon v. Amir (In re Amir)*, 436 B.R. 1, 16 (B.A.P. 6th Cir. 2010); *In re Bage*, 2014 WL 4749072 at *3, 2014 Bankr. LEXIS 4069 at *7 (Bankr. N.D. Ohio Sept. 24, 2014); *In re McFadden*, 477 B.R. 686, 691 (Bankr. N.D. Ohio 2012).

In this case, there does not appear to be a dispute that the debt owed to Huntington is "a large single debt" that the Debtors are seeking to avoid. While the amount owed to Huntington is approximately $125,000, the other unsecured debt in this case is approximately $2,300. Even deducting the value of $32,000 for the Stitt Street real estate that the Debtors listed on Schedule D, the potential unsecured deficiency claim of Huntington is clearly "a large single debt". *See e.g.*, *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1260 (11th Cir. 2013)(debt of $161,383 out of a total debt of $319,000 qualified as a "large, single debt").

However, courts have held that the presence of a single large debt, standing alone, "is insufficient to find cause for dismissal" of a Chapter 7 case. *In re Bage*, 2014 WL 4749072 at *3, 2014 Bankr. LEXIS 4069 at *9 (Bankr. N.D. Ohio Sept. 24, 2014); *In re Peterson*, 524 B.R. 808, 814 (Bankr. S.D. Ind. 2015); *Modi v. Verani (In re Verani)*, 2015 WL 6146029 at *5, 2015 Bankr. LEXIS 3526 at *16 (Bankr. N.D. Ga. Oct. 15, 2015); *In re Ajunwa*, 2012 WL 3820638 at *7, 2012 Bankr. LEXIS 4096 at **22-23 (Bankr. S.D.N.Y. Sept. 4, 2012); *In re Sudderth*, 2007 WL 119141, at *2, 2007 Bankr. LEXIS 115 at *6 (Bankr.

---

[5]/ The Zick decision used the term "bad faith" 11 times, and the term "lack of good faith" 9 times. Courts often use the two terms interchangeably. *See*, *In re Wilcox*, 539 B.R. 137, 148 n.17 (Bankr. S.D. Tex. 2015); *In re Guiterez*, 528 B.R. 1, 14 n. 5 (Bankr. D. Vt. 2014).

[6]/ *Zick*, 931 F.2d at 1127.

5

M.D.N.C. 2007); *In re Keobapha,* 279 B.R. 49, 52-53 (Bankr. D. Conn. 2002); 6 Collier on Bankruptcy ¶707.03[2], p. 707-18 (16th ed. 2013)("However, the fact that there is only one significant creditor, so that the bankruptcy case is essentially a two-party dispute is not, by itself, cause for dismissal.").

The existence of a large single debt arising from a personal guarantee of business debt has been described as "not uncommon" and "hardly remarkable". *See*, *In re Bushyhead*, 525 B.R. 136, 149 (Bankr. N.D. Okla. 2015).

Courts have looked for additional factors where there is a single (or very few) large creditor(s). The first is manipulation to reduce the number of creditors. *Zick*, 931 F.2d at 1126 n.1 & 1128 ("the debtor's manipulations which reduced the creditors in this case to one"); *In re Peterson*, 524 B.R. 808, 814 (Bankr. S.D. Ind. 2015)("whether the debtor has manipulated the bankruptcy process to frustrate one particular creditor"); *In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995)(citing *Zick*). The second factor that courts consider is whether there was evidence of an "intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *In re Guitierrez*, 528 B.R. 1, 15 (Bankr. D. Vt. 2014)(quoting *In re Zick*, 931 F.2d at 1129). Third, the case law focuses on whether "[t]he debtor employed a deliberate and persistent pattern of evading a single major creditor." *In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995)(No. 11); *see also*, *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 374 (3rd Cir. 2007).

Where the existence of a large single debt has been a major factor in granting dismissal it appears that the "accumulation of the debt"[7] often incurred through wrongful conduct by the debtor. *See.*, *Grand Valley State Univ. v. Hodge*, 2004 U.S. Dist. LEXIS 6175 at *10 (W.D. Mich March 30, 2004)("in most cases in which a petition was found to be in bad faith for this reason, the debt was incurred by a defendant who had been found liable for some wrongdoing."), *adopted by*, *Grand Valley State Univ. v. Hodge*, 130 F. App'x 793, 2005 WL 1123317, 2005 U.S. App. LEXIS 8401 (6th Cir. May 11, 2005); Article: The Good Faith Fable of 11 U.S.C. § 707(a): How Bankruptcy Courts Have Invented A Good Faith Filing Requirement for Chapter 7 Debtors, 13 Bank. Dev. J. 61, 85 (Winter, 1996); *see also*, *In re Griffieth*, 209 B.R. 823, 830 (Bankr. N.D.N.Y. 1996)(section titled: "Debtors Inaction Over a Period of Years Renders Their Tax Liability Self-Created"); *In re Eddy*, 288 B.R. 500 (Bankr. E.D. Tenn. 2002)(failure to turnover life insurance proceeds that were to have been held in trust for surviving children). The business loan in

---

[7]/ *McDow v. Smith*, 295 B.R. 69, 82 (E.D. Va. 2003).

6

this case was not wrongfully incurred, and it was paid down from $175,000 to $125,000 over a period of seven years[8] before Mrs. McVicker retired and the Debtors made the decision that it was time to stop using their income from other sources, like Social Security and retirement savings, to pay the commercial loan secured by the Stitt Street properties.

Here, the Debtors have not engaged in "excessive and continued expenditures", nor have they lived a "lavish" lifestyle. Mr. McVicker has social security disability income of $2,248 per month. Mrs. McVicker receives a pension of $606 per month. The McVickers withdraw monies from their retirement accounts in the approximate amount of $850 per month to cover living expenses of just over $3,700 a month. [Pl. Ex. 1, Sched. I & J]. They own a 2005 Ford Focus, a 2005 Ford F-250, and a 1987 Airstream Travel Trailer. [Pl. Ex. 1, Sched. B, p. 12]. The McVickers also maintain a Hartford life insurance policy with a premium of approximately $4,374 annually. The court does not find this to be indicia of "excessive expenditures" or a "lavish" lifestyle for purposes of Section 707(a).

In fact, it appears that the McVickers would be below the median income level for Ohio debtors. The Debtors list income of $3,704 per month, including $2,248 in Social Security which is not counted when "median income" is calculated. [Pl. Ex. 1, Schedule I, p. 20-21]. Gross income of $3,704 per month translates into an annual income of $44,448. Taking out the Social Security income that is statutorily excluded under 11 U.S.C. §101(10A)(B),[9] the debtors' annual income for purposes of calculating whether the Debtors would be above, or below, the median income level is $17,472[10]. For Ohio debtors who filed between April 1, 2015 and May 14, 2015, the median income level was $54,420[11].

While the Debtors do not have "primarily consumer debts", making §707(b) inapplicable, the

---

[8]/ Payments of three years cited where debtor stopped payments and filed bankruptcy to avoid a single large debt. *See*, *In re Smith*, 468 B.R. 235, 239 (Bankr. W.D. Ky. 2012)(case under §707(b)) .

[9]/ *See*, *Baud v. Carroll*, 634 F.3d 327, 345-46 (6th Cir. 2011)(Social Security was statutorily excluded from disposable income calculations by 11 U.S.C. §101(10A)(B), which became part of the Bankruptcy Code in 2005).

[10]/ Notably, this total does not include the rental income from the three Stitt Street apartments that have been rented. Those monies may first go to Cutting Edge Rentals, LLC. But even if the rental income were fully attributable to the debtors, the amount would have to be more than $3,000 a month to put them over the median income level. The evidence presented at the Hearing, and the transcript of the 2004 Examination submitted by Huntington suggests that the gross rental income from the Stitt Street apartments is no more than $1,350. [Doc. #40, Pl. Ex.16, p. 176]. If the rent was paid on time, the gross rental income would be $1,200 a month. [*Id.*, p. 177].

[11]/ *See*, http://www.justice.gov/ust/eo/bapcpa/20150401/bci_data/median_income_table.htm

7

choices Congress made in that subsection appear to be relevant in determining whether dismissal is appropriate under the *Zick* standard.[12] Accordingly, this court will look at the Congressional choices that were made in structuring 11 U.S.C. §707.

Under Section 707(b), a creditor, like Huntington, would not have standing bring an action to dismiss for "abuse" in a case involving primarily consumer debts unless the debtors were over the median income level. *See*, §707(b)(6); 6 Collier on Bankruptcy ¶707.03.[2], p. 707-20 (16th ed. 2013). Only the bankruptcy judge, the Office of the United States Trustee, or in non-U.S. Trustee states, a bankruptcy administrator can bring an action for "abuse" by debtors who have income below the median level for their state. Moreover, §707(b)(7) specifically forbids "ability to pay" arguments for consumer debtors who are below the median income level. The commentary in Collier goes even further: "It seems clear that the 'bright line test' of section 707(b)(7) means that no chapter 7 case should be dismissed based on a debtor's ability to pay if the debtor has an income below the safe harbor threshold." 6 Collier on Bankruptcy ¶707.04.[3][b], p. 707-30 (16th ed. 2013). The treatise continues:

> The median income threshold adopted by Congress for means testing recognizes that families with incomes below that threshold do not have the ability to pay significant amounts to their creditors while maintaining a reasonable living standard. Courts should not attempt to evade this congressional intent by using some alternative means test to find "abuse" on the part of debtors whose incomes are below the applicable median income threshold.

6 Collier on Bankruptcy ¶707.04.[3][b], p. 707-31 (16th ed. 2013).[13]

In enacting the 2005 BAPCPA amendments, Congress changed §707(b)'s "substantial abuse" test by deleting the word "substantial" from the statute, permitting creditors to seek dismissal of Chapter 7 cases filed by consumer debtor under a new lower "abuse" standard. In doing so, Congress also added new statutory protections, preventing creditors from bringing actions against below median consumer debtors (§707(b)(6)), and protects those lower income debtors from having to respond to "ability to pay" arguments

---

[12]/ The *Zick* court looked at §707(b) in considering *In re Latimer*, 82 B.R. 354 (Bankr. E.D. Pa. 1988), quoting *In re Krohn*, 886 F.2d 123 (6th Cir. 1989)(a §707(b) case) , and discussing the rationale of *In Re Jones*, 114 B.R 917 (Bankr. N.D. Ohio 1990).

[13]/ It is not entirely clear that Collier intends to speak to both §707(a) and §707(b) in this passage. And, if that is the intent, it is even less clear that the Sixth Circuit would endorse the collapsing of the two subsections. However, the point being made by Collier supports this court's position that "belt tightening" is not an unvarying requirement that must be mechanically imposed on every debtor, regardless of their underlying financial circumstances.

15-31428-jpg    Doc 66    FILED 02/17/16    ENTERED 02/17/16 16:49:16    Page 8 of 24

by any party in interest (§707(b)(7)).

Debtors who do not have primarily consumer debts, like the McVickers, are protected - entirely - from an action to dismiss their case under §707(b) because that provision is limited to cases "filed by an individual debtor under this chapter whose debts are primarily consumer debts". *See*, §707(b). Thus, Huntington is proceeding under the more difficult standard of proof required under §707(a), for debtors who do not have primarily consumer debts. The Bank is seeking dismissal under a standard where a finding of "cause" is limited to "egregious cases" under *Zick*. Huntington points to a lack of evidence of "belt tightening" as part of its argument that the Debtors should not be allowed to proceed in bankruptcy, because they have the ability to pay. It would be very odd to read into §707(a) a requirement that debtors demonstrate that they engaged in "belt tightening" when the debtors are under-the-median non-consumer debtors. That cannot be an unbending prerequisite to obtaining relief under Chapter 7, when a creditor would not even have standing to question whether such a case was an "abuse" if the Debtors were consumer debtors.[14] Accordingly, it appears that courts are not required to mechanically impose a "belt tightening" requirement, particularly where debtors have income below the median income level, and are living within their means.[15] *See*, *In re Smith*, 468 B.R. 235, 239 (Bankr. W.D. Ky. 2012)(in discussing *Spagnolia* factors: "the Debtor did not need to make lifestyle adjustments to curb a lavish lifestyle. As just stated, the Debtor lived a very frugal lifestyle, and did not live above his means."); *First Capital Bank of Ky. v. Blok*, 2012 WL 1682042, 2012 U.S. Dist. LEXIS 66963 (S.D. Ind. May 14, 2012)("First Capital attempts to liken the Debtors as the type of people who refuse to make lifestyle adjustments to pay their creditors. The evidence does not support this view.").

Nor has there been any allegation, or evidence presented, regarding the concealment or

---

[14]/ The point here is a very narrow one. The case law regarding the relationship between §707(a) and the changes made to §707(b) by the BAPCPA amendments is far from settled. *See* e.g., *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 369-371 (3rd Cir. 2007)(holding that §707(a) and §707(b) are not a "commonly associated group or series."). Nevertheless, the structure of the two statutes - with §707(b) excluding from its reach debtors who do not have primarily consumer debts and also providing additional protections to below-median-income debtors with consumer debts - does not support the idea that a showing of belt tightening is required by all debtors (particularly below-median-income debtors) to avoid "for cause" dismissal under §707(a). Moreover, this is consistent with the statement in *Zick* that: "The section [§707(a)] does not contemplate . . . that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. . . ." *In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1991); *also cf.*, *In re Bushyhead*, 525 B.R. 136, 142-143 & 148 (Bankr. N.D. Okla. 2015)(citing legislative history).

[15]/ Of course, this discussion of income does not address Huntington's arguments regarding the size and scope of Debtors' exempt property, which are reviewed below.

misrepresentation of assets and/or sources of income. Thus, just looking at the factors specifically listed in *Zick*, the matter in issue would be whether the desire to discharge the single large debt owed to Huntington involved "conduct akin to fraud, misconduct, or gross negligence." Here, there is no evidence of the Debtors having engaged in pre-petition transfers or exemption planning, intentionally reducing other debts to just leave the obligation to Huntington to be discharged, or being motivated by a purpose other than obtaining an economic fresh start. One of the facts that Huntington relies on is that "rental unit number 2652 A Stitt Street has been unoccupied and unfit for occupation for more than a year". [Doc. #40, ¶¶24-25, p. 5-6]. However, this does not appear to support Huntington's contention that something akin to fraud or sharp dealings occurred in this case. The unrebutted testimony of the Debtors was that the apartment was severely damaged, and became uninhabitable, in late 2007. The Debtors, with only the income from three rentable apartments, continued to make payments to Huntington on their loan from that date in late 2007 through the last payment on November 27, 2014. The Debtors did not immediately disregard their obligations under the loan agreement when they suffered a set back. Under these circumstances, it is hard to see how - when the testimony reflects that the rents from the three apartments do not support the loan payment today - that the Debtors were not engaging in some form of "belt-tightening" for more than six years to make their monthly payments to Huntington, even though the rentals almost certainly did not cash flow the loan.

The *Zick* decision also endorses the use of a "smell test" to determine whether a Chapter 7 filing meets the high bar of being the kind of egregious case that should be dismissed under §707(a). This would appear to encompass more than the specific factors that were listed.[16] The *Zick* court also stated that the facts establishing a lack of good faith for purposes of §707(a) "are as varied as the number of cases."

In evaluating contested motions to dismiss under §707(a), some courts in the Sixth Circuit have looked at a list of 14 factors set forth in the *Spagnolia* decision:

1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.

2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle.

3. The debtor filed the case in response to a judgment pending litigation, or collection action; there

---

[16]/ Some decisions view *Zick* as endorsing a "totality of the circumstances" test. But that term does not appear in the *Zick* decision.

is an intent to avoid a large single debt.

4. The debtor made no effort to repay his debts.

5. The unfairness of the use of Chapter 7.

6. The debtor has sufficient resources to pay his debts.

7. The debtor is paying debts to insiders.

8. The schedules inflate expenses to disguise financial well-being.

9. The debtor transferred assets.

10. The debtor is over-utilizing the protection of the Code to the unconscionable detriment of creditors.

11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.

12. The debtor failed to make candid and full disclosure.

13. The debts are modest in relation to assets and income.

14. There are multiple bankruptcy filings or other procedural "gymnastics.",

*In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995); *see also*, *Grand Valley State Univ. v. Hodge*, 2004 U.S. Dist. LEXIS 6175, at *7 (W.D. Mich. March 30, 2004)(citing *Spagnolia* factors), *adopted by*, *Grand Valley State Univ. v. Hodge*, 130 F. App'x 793, 2005 WL 1123317, 2005 U.S. App. LEXIS 8401 (6th Cir. May 11, 2005); *In re Cassel*, 1999 U.S. Dist. LEXIS 13349 at *13-15 (E.D. Mich. Aug. 13, 1999), *aff'd*, *Cassell v. Kurily (In re Cassel)*, 230 F.3d 1357 (unpublished), 2000 WL 1478377, 2000 U.S. App. 25281 (6th Cir. Sept. 29, 2000)

Based on the evidence presented, it appears that some of the *Spagnolia* factors may apply to this case - specifically, numbers 3, 5, 6, and 10, as well as, perhaps, numbers 2 and 13. Factor number 3 relates to the Huntington debt being the largest debt and the primary motivation for the filing of this Chapter 7, which was discussed above. Weighing the rest of the factors, numbers 5, 6, 10, and 13, essentially turns on the question of whether the decision to file a Chapter 7 bankruptcy, rather than use exemptible homestead equity or retirement funds to pay the debt owed to Huntington, is an unfair use of Chapter 7.

**1.      Debtors' Exemption Rights Under The Bankruptcy Code.**

One of the most important guides in making a decision as to whether or not there is "unfairness" in a debtor's use of Chapter 7, or the extent to which a debtor is "over-utilizing" the protections of the Code,

11

should be the relief Congress specifically provided in the legislation itself.[17]  There are several instances in the Code where the exemption rights of debtors were balanced against the rights of creditors to the payment of their just debts.  Those legislative choices, made by Congress, must inform the court's view of whether the Debtors in this case have overreached, and should be denied bankruptcy relief.

One choice that Congress made was to protect exemptions from waiver.  Under 11 U.S.C. §522(e), any pre-petition waiver of exemption rights by a debtor in favor of a creditor holding an unsecured claim is unenforceable in a case under the Code.  *See e.g.*, *In re Kadoch*, 528 B.R. 626, 638-639 (Bankr. D. Vt. 2015); *In re D'Italia*, 507 B.R. 769, 773-775 (Bankr. D. Mass. 2014); 4 Collier on Bankruptcy ¶522.07, p. 522-43 (16th ed. 2009).

Another choice was the Bankruptcy Code's exclusion of exempt assets from the statutory balance sheet in the definition of "insolvency" found in 11 U.S.C. §101(32)(A)(ii).  One of the primary uses of this defined term is in the context of preferential transfer recovery - where debts have been paid to non-insider creditors during the 90 days prior to filing.  By defining a debtor as "insolvent" based upon a balance sheet test that does not include exempt property, the statute requires disgorgement of preferential payments made on just debts, even in cases where the inclusion of exempt property would render a debtor solvent on a balance sheet basis.

In reorganization cases, the broadly used "best interest of creditors test" also reflects a choice where Congress put a debtor's right to benefit from exemptions ahead of a creditor's right to payment.  *See*, 11 U.S.C. §§1129(a)(7)(A); 1225(a)(4); 1325(a)(4).  In the context of a Chapter 13 repayment plan, the *Penland* court stated: "An exemption the legislature has provided should not be denied or impaired simply because a judge finds it to be out of proportion." *Penland v. Rakozy (In re Penland)*, 2006 WL 6811002 at *7, 2006 Bankr. LEXIS 4838 at *21 (9th Cir. BAP Aug. 17, 2008).  The *Penland* decision concludes: "Given that the legislative branch has specifically provided for the protection of exempt assets, any

---

[17]/ There is certainly a tension between the concerns expressed in *Huckfeldt* and the *Zick* "smell test".  The *Huckfelt* court noted that earlier bankruptcy decisions had expressed concerns that the open-ended use of bad faith to dismiss Chapter 7 cases under §707(a) would be too subjective.  The fear being that "bad faith inquiry will be 'employed as a loose cannon which is to be pointed in the direction of a debtor whose values do not coincide precisely with those of the court.' *In re Latimer*, 82 Bankr. 354, 364 (Bankr. E.D. Pa. 1988).  These are legitimate concerns."  *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir. 1994); *see also*, *In re Landes*, 195 B.R. 855, 863 (Bankr. E.D. Pa. 1996); 13 Bank. Dev. J. 61, 91 (Winter, 1996)("Possibly, the real reason these courts reached different outcomes from very similar facts is simply that the "smell test" was being administered through different noses.").  In an unpublished decision, the Sixth Circuit emphasized that the "smell test" should be based on objective factors.  *See*, *Merritt v. Franklin Bank, N.A. (In re Merritt)*, 2000 WL 420681, 2000 U.S. App. L; EXIS 6877 (6th Cir. April 12, 2000).

12

determination that the failure to use exempt assets to fund a plan constitutes bad faith should be supported by a finding that the Penlands affirmatively engaged in bad faith conduct, such as aggressive and fraudulent pre-bankruptcy planning."[18] *Penland*, 2006 WL 6811002 at *8, 2006 Bankr. LEXIS 4838 at *22.

A relatively recent Supreme Court decision has changed the legal landscape for exemptions. In *Law v. Siegel*, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014), the United States Supreme Court addressed the question of whether a debtor's misrepresentations regarding a fraudulent lien would allow a trustee to surcharge an otherwise valid $75,000 exemption for the costs associated with recovering the concealed equity in the debtor's residence. The bankruptcy court had permitted the surcharge, apparently reasoning that it had the equitable and inherent power to do so to protect the integrity of the bankruptcy system. The Bankruptcy Appellate Panel and the Ninth Circuit Court of Appeals both affirmed. However, in a unanimous decision the Supreme Court reversed, stating that it was "hornbook law" that bankruptcy courts cannot "override explicit mandates of other sections of the Bankruptcy Code." *Siegel*, 134 S.Ct. at 1194, 188 L.Ed.2d at 153. Because 11 U.S.C. §522(b)(3)(A) allows a debtor to exempt equity in his residence, and §522(k) prohibits use of the exemption to pay "any administrative expense," the debtor was entitled to the benefit of the exemption, despite his misrepresentations regarding the fraudulent lien that made it appear there was no non-exempt equity in his residence.

In addition to the holding on the specific issue of surcharge, the Supreme Court made an additional statement regarding exemptions, stating that the Bankruptcy Code does not confer "a general, equitable power in bankruptcy courts to deny exemptions based on a debtor's bad faith conduct." *Siegel*, 134 S.Ct. at 1196, 188 L.Ed.2d at 155. "[F]ederal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code." *Id*. (original emphasis on "federal law" omitted).

While the weight to be afforded to the *dicta* in *Siegel* remains an open question in some jurisdictions, the Sixth Circuit has held that: "Under *Siegel*, bankruptcy courts do not have authority to use their equitable powers to disallow exemptions or amendments to exemptions due to bad faith or misconduct." *Ellmann v. Baker (In re Baker)*, 791 F.3d 677, 683 (6th Cir. 2015).

Following *Siegel* and *Baker*, a recent decision from Tennessee held that even where debtors had allegedly engaged in fraudulent exemption planning, the exemptions would be allowed over the Chapter

---

[18]/ The concurring opinion would have preferred to hold that "the implications of use or non-use of exempt assets is a fact-intensive inquiry that presents a question of degree that ultimately rests on the discretion of the trial judge in evaluating the totality of the circumstances." *Penland*, 2006 WL 6811002 at *8, 2006 Bankr. LEXIS 4838 at *23.

7 trustee's objection. As the *Hurt* court stated: "exemption planning, even bad faith exemption planning does not necessarily justify disallowance of the exemption." *In re Hurt*, 2015 Bankr. LEXIS 4397 at *8 (Bankr. E.D. Tenn. Dec. 31, 2015). In the above captioned case, there is no evidence that the Debtors engaged in any "exemption planning".[19] The homestead exemption applies to real estate where the Debtors have lived for a number of years. The retirement funds are largely the product of Mr. McVicker working for Columbia Gas for most of his adult life.

Prior to the *Law v. Siegel* decision, there was at least one case where the ability to use exempt property to pay a debt (combined with other indicia of bad faith) was held to be a factor supporting dismissal under §707(a). *See*, *In re Fiero*, 2008 Bankr. LEXIS 1573 (Bankr. E.D.N.C. May 12, 2008)("The debtor has the ability to pay her debts, both from her income and from her exempt assets."). It is doubtful that *Fiero*'s reasoning would be found persuasive today. Essentially, a §707(a) dismissal based upon an ability to pay using exempt property would be doing indirectly that which the Supreme Court has prohibited bankruptcy courts from doing directly - putting a constraint on exemptions without a clear statutory basis.

Two other subsections of the Bankruptcy Code where Congress sided with a debtor's exemption rights over a creditor's right to payment are 11 U.S.C. §§522(g) and (h). Under these provisions, individual chapter 7 debtors are entitled to avoid "preferential transfers" (that were not voluntarily made, or concealed) in order to protect their exemption rights in the property so transferred if the trustee does not seek to avoid those transfers. *See*, 5 Collier on Bankruptcy ¶547.11[2][a], p. 547-95 (16th ed. 2014); *Dickson v. Countrywide Home Loans (In re Dickson)*, 655 F.3d 585, 591-593 (6th Cir. 2011); *McLane v. Bostater (In re McLane)*, 526 B.R. 238 (Bankr. N.D. Ohio 2015). Thus, even when a debtor's property was taken by a creditor in payment of a just debt, and notwithstanding the fact that no creditor would benefit from the recovery of the transferred funds, the Bankruptcy Code specifically permits debtors to recover, and keep for their own use, involuntarily transferred property in which the debtor may claim an exemption.

The Bankruptcy Code also provides for the avoidance of a creditor's valid judgment lien - even one of long standing - if that judgment lien impairs a debtor's exemption. *See*, 11 U.S.C. §522(f). In 1994 Congress amended the language of §522(f) to legislatively overrule cases like *In re Dixon*, 885 F.2d 327

---

[19]/ The Debtors did benefit, and Huntington's position was eroded, by increases in the Ohio homestead exemption after the loan documents were executed on August 16, 2007. [Doc. #40, Pl. Ex. 12, p. 106]. The documents reflect that the loan was made when the Ohio homestead exemption was $5,000. But, that is a consequence of changes in Ohio's homestead exemption provision, not transfers or other manipulations of property interests.

14

(6th Cir. 1989) that narrowly interpreted a debtor's right to use the judgment lien avoidance provision.  *See*, *In re Holland*, 151 F.3d 547, 549 (6th Cir. 1998).  While one of Huntington's complaints regarding this case is that their cognovit judgment lien was avoided under §522(f), that is a statutory right given to debtors by Congress.

These examples of choices that Congress made regarding exemptions, as well as the recent holding in *Siegel*, support finding that the Bankruptcy Code does not support subordinating a debtor's ability to use a statutory right to claim an exemption to a creditor's right to payment of valid debts.  Further, as one court has stated: "The purpose of a bankruptcy case is to allow debtors to avoid the payment of debt, preserve the exemptions they may have in property,[20] and obtain a fresh start.  Preserving property and receiving a discharge of dischargeable debt are valid purposes for filing a bankruptcy case."  *Modi v. Verani (In re Verani)*, 2015 WL 6146029 at *5, 2015 Bankr. LEXIS 3526 at *16 (Bankr. N.D. Ga. Oct. 15, 2015).

### 2.    Ohio Law Regarding Exemptions.

The homestead exemption claimed by the Debtors in this case is provided by an Ohio statute.  As authorized by 11 U.S.C. §522(b)(2), the Ohio legislature opted out of the federal exemptions provided in § 522(d).  *See*, Ohio Rev. Code §2329.662.  As a result, Ohio debtors in bankruptcy may generally only claim a homestead exemption in an amount permitted under state law.

"Ohio law has provided for a Homestead Exemption for over 160 years."  *In re Davis*, 539 B.R. 334, 349 (Bankr. S.D. Ohio 2015).  Prior to 2008, Ohio had one of the lowest homestead exemptions in the country.  The Ohio homestead exemption was $5,000 in 1980[21] and it remained at that level until O.R.C. §2329.66(A)(1) was amended in 2008,[22] increasing the Ohio homestead exemption to $20,200.  Effective March 27, 2013, the Ohio homestead exemption increased to $125,000.  *Id*.  Unlike the period from 1980

---

[20]/ One of the main cases relied upon by Huntington in support of dismissal under §707(a) is *In re 3710 Henricks Rd. Corp.*, 331 B.R. 757, 761-762 (Bankr. N.D. Ohio 2005).  One important difference between that case and this one is that *Henricks* involved a corporation, which cannot claim exemptions (because that is a right limited to "an individual debtor" under §522(b)), and cannot receive a "fresh start" because a Chapter 7 debtor receives a discharge "unless the debtor is not an individual" (§727(a)(1)).  In the Bankruptcy Code, "individual" means a flesh-and-blood human being, not a business entity.  *See e.g.*, *Friedman v. Comm'r*, 216 F.3d 537, 548 n.7 (6th Cir. 2000).

[21]/  *See*, *In re Hicks*, 3 B.R. 459 (Bankr. N.D. Ohio 1980)(Judge Harold F. White's discussion of the Ohio legislature enacting a $5,000 exemption in September of 1979).

[22]/  *See*, *In re Davis*, 539 B.R. 334, 337 & n. 4 (Bankr. S.D. Ohio 2015)("In 2008, the Ohio General Assembly amended Ohio Revised Code § 2329.66 to increase the Homestead Exemption to $20,200.00" & "The 2008 Amendment became effective September 30, 2008.").

to 2008, the Ohio homestead exemption is now subject to periodic adjustment, and is currently $132,900. *Id.*, at n.5.

"Exemptions promote a variety of public-policy aims: (1) providing the debtor with that property which is necessary for their survival; (2) enabling the debtor to rehabilitate themselves; and (3) protecting the debtor's family from the adverse effects of impoverishment." *In re Felgner*, 2011 WL 5056994 at *2, 2011 Bankr. LEXIS 4118 at *4 (Bankr. N.D. Ohio 2011). "Without the homestead exemption, many debtors could be forced to sell their residence to satisfy creditors, potentially leaving the debtor homeless, shifting the costs of the debtor's care, at least temporarily, onto housing shelters or government programs, instead of creditors who were aware of nonpayment risks when extending credit." *In re Way*, 2014 WL 4658745 at *3, 2014 Bankr. LEXIS 3985 at *8 (Bankr. N.D. Ohio Sept. 17, 2014).

While Ohio's homestead exemption has gone from one of the very lowest in the country to a comparatively generous level, the current amount of Ohio's homestead exemption was decided through the state legislative process. Bankruptcy Courts were not able to equitably expand the homestead exemption when it was $5,000 in 2007. To the extent that Huntington is attempting to equitably contract the homestead because it seems too generous - even though the full amount of the homestead exemption is not being utilized in this case[23] - the decision on the proper amount to be allowed as a homestead exemption by the Ohio legislature[24] is entitled to considerable weight in determining whether the use of that exemption is "cause" for dismissal, even under a federal statute like 11 U.S.C. §707(a).

The *Zick* court stated that §707(a) dismissal is limited to "egregious cases". There was no exemption planning, or asset transfers alleged to have occurred prior to the filing of this case. The Debtors simply have equity in a home they have owned for a substantial period of time. Thus, it is difficult to see how anything other than the dollar amount of the homestead exemption, as determined by the Ohio Legislature, would satisfy the *Zick* standard for involuntary dismissal of a non-consumer case. The amount provided for in §2329.66(A)(1) may be overly generous - the Ohio Legislature may at some point reconsider and elect to

---

[23]/ If the mortgage is $93,000 and the home is worth $200,000, the equity in the residence would be $107,000. Under Ohio law, each Debtor would be entitled to claim $132,900, and as a married couple filing jointly, they could protect up to $265,800. Thus, the actual amount of equity being protected here is less than half of the maximum allowed by the statute.

[24]/ The issue of the proper deference to be given to legislatively created exemption statutes, and a bankruptcy judge's "sense of proportion" trace back at least as far as Judge Arnold's dissent in *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 877-879 (8th Cir. 1988).

15-31428-jpg    Doc 66    FILED 02/17/16    ENTERED 02/17/16 16:49:16    Page 16 of 24

reduce the exemption. But it is difficult to see how simply claiming an exemption in less than the full amount provided by Ohio law would rise to the level of being "egregious". *See e.g.*, *In re Ajunwa*, 2012 WL 3820638 at *7, 2012 Bankr. LEXIS 4096 at *13 (Bankr. S.D.N.Y. Sept. 4, 2012)("This Court cannot find a debtor's exercise of a right to use a state-authorized exemption to be an 'unfair manipulation' of the Code.").

It is true that the federal homestead exemption is less. At the time the McVickers filed this Chapter 7 case the homestead exemption provided by Bankruptcy Code Section 522(d)(1) was $22,975. Even with a combined total of $45,950 for both Mr. and Mrs. McVicker, that is less than the approximately $107,000 in equity that the Debtors appear to have in their residence. However, the enactment of Section 522(d) was an attempt to make exemptions more uniform throughout the country by establishing a <u>minimum</u> set of exemptions. *See*, *In re Sapp*, 81 B.R. 545, 547 (Bankr. W.D. Mo. 1987)("Congress had spelled out in §522(d) what it considered to be the basic minimums necessary to supply the fresh start"); *In re Kaufman*, 68 B.R. 391, 393 (Bankr. S.D.N.Y. 1986); 4 Collier on Bankruptcy ¶522.02[1], p. 522-16 (16th ed. 2009). The fact that the Debtors have claimed an exemption in excess of a minimum would not, in itself, support a finding that the Debtors' filing took advantage of the Bankruptcy Code in an "egregious" manner.

More relevant to this inquiry would be where the Code sets an <u>upper</u> limit on the homestead exemption. Congress enacted a homestead cap that would apply only to an interest in property acquired "during the 1215-day period preceding the date of the filing of the petition that exceeds the aggregate $155,675 in value in – (A) real or personal property that the debtor or a dependant of the debtor uses as a residence". *See*, 11 U.S.C. §522(p)(1). There is a similar limitation imposed, capping the exemption at $155,675, if a debtor engaged in certain criminal conduct. *See*, 11 U.S.C. §522(q). Like the Ohio homestead exemption, the $155,675 applies to each debtor's interest, making the total $311,350. *See*, 5 Collier on Bankruptcy ¶522.13[4], p. 522-127 (16th ed. 2013). Accordingly, even where a debtor has done aggressive exemption planning, or committed certain bad acts - not even arguably present in this case - the Bankruptcy Code would permit allowance of a homestead exemption far in excess of what the Debtors have claimed in this case.

**3.     The Exclusion Of The Retirement Funds From The Bankruptcy Estate.**

Huntington also asserts that the failure to use retirement savings is a basis for dismissal of this case under §707(a). The Debtors each have an IRA listed in the respective amounts of $550,255.91 and

17

$26,734.14. [Pl. Ex. 1, Schedule B, p. 11].

Prior to 1992, there was a split of authority as to whether ERISA-qualified retirement funds were excluded from the bankruptcy estate under 11 U.S.C. §541(c)(2) by "applicable nonbankruptcy law". That issue was decided, in favor of protecting ERISA-qualified accounts, in the Supreme Court's decision *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

In 2005[25], Congress clarified and expanded the exemption status of certain tax-qualified retirement plans. To protect individuals in states (like Ohio) that had opted-out of the federal exemptions, Congress added §522(b)(3) to include retirement funds to the extent that the funds were in an account exempt from taxation under specified sections of the Internal Revenue Code.

> To expand the protection of certain tax-exempt retirement plans, Congress created as part of the 2005 Act a category of exemption rights that may be exercised by the debtor even if the debtor's state has opted out of the federal exemption scheme. In addition to exemptions under the laws of the debtor's domicile, the debtor is entitled to exempt under section 522(b)(3)© retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457 or 501(a) of the Internal Revenue Code. These sections of the Internal Revenue Code deal with . . . individual retirement accounts ("IRAs"); ....

5 Collier on Bankruptcy ¶522.10[9], p. 522-91 (16th ed. 2014).

This new exemption provision was not contingent upon a determination as to whether or not the funds were "reasonably necessary for support of the debtor or the debtor's dependents." *Compare*, former 11 U.S.C. §522(d)(10)(E) (2005), *with* 11 U.S.C. §522(b)(3)©; *see also*, House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess, 63-64 (2005); *Bierbach v. Tabor (In re Tabor)*, 433 B.R. 469, 474-475 (Bankr. M.D. Pa. 2010). However, there is a statutory "cap" for individual retirement accounts. *See*, *Clark v. Rameker*, 134 S.Ct. 2242, 2249, 189 L.Ed.2d 157, 167 (2014)("Congress . . . imposed a value limitation on the amount of exemptible retirement funds in a separate provision, §522(n).").

Section 522(n) provides:

(n) For assets in individual retirement accounts described in section 408 or 408A of the Internal Revenue Code of 1986, other than a simplified employee pension under section

---

[25]/ "Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA or Act) to correct perceived abuses of the bankruptcy system." *Milavetz, Gallop, & Milavetz, P.A. v. United States*, 559 U.S. 229, 231-32, 130 S. Ct. 1324, 1329, 176 L. Ed. 2d 79, 84 (2010)

408(k) of such Code or a simple retirement account under section 408(p) of such Code, the aggregate value of such assets exempted under this section, without regard to amounts attributable to rollover contributions under section 402©, 402(e)(6), 403(a)(4), 403(a)(5), and 403(b)(8) of the Internal Revenue Code of 1986, and earnings thereon, shall not exceed $ 1,245,475 in a case filed by a debtor who is an individual, except that such amount may be increased if the interests of justice so require.

Huntington points to the Debtors having "nearly $600,000 in cash available to them in various IRAs and related products, with which they could have easily paid off the loan more than 4 times over." [Doc. #40, p. 2, ¶4]. But, even if the Congressionally imposed cap of $1,245,475 applied to the Debtors in this case,[26] the Debtors are well below that limit. This is an additional factor that weighs against a finding of "cause" based upon this being an "egregious case" under *Zick*.

Huntington focuses on the fact that the Debtors are currently only withdrawing $850 a month from their retirement savings. At that rate, even without factoring in interest, their retirement savings would last longer than their likely life span. The Bank also emphasizes the fact that the McVickers' retirement accounts are more than four times the amount of the remaining loan balance on the Huntington debt. However, a decision by Congress to protect retirement accounts at dollar levels even greater than the Debtors have in this case is not irrational or absurd. The United States Supreme Court has cited a House Report stating: "'[t]he historical purpose' of bankruptcy exemptions has been to provide a debtor 'with the basic necessities of life' so that she 'will not be left destitute and a public charge.'" *Clark v. Rameker*, 134 S. Ct. 2242, 2247 n.3, 189 L.Ed.2d 157, 166 n.3 (2014). Sickness, nursing care, assisted living expenses, inflation, the risk of possible reductions in government programs like Social Security and Medicare – there are many reasons why more than $850 a month might be required for the McVickers' to meet their reasonable needs in the future. *See*, *In re Karn*, 2014 WL 3844829 at *2, 2014 Bankr. LEXIS 3299 at *6-7 (Bankr. N.D. Ohio Aug. 4, 2014).

As the *Velis* court stated:

There can be no doubt that Congress has expressed a deep and continuing interest in the preservation of pension plans, and in encouraging retirement savings, as reflected in the

---

[26]/ It appears that the cap would not apply because Mr. McVicker testified that the source of the funds for his IRA came from a rollover from his employer sponsored retirement account. *See*, 5 Collier on Bankruptcy ¶522.10[9], p. 522-92.1 (16th ed. 2014)("This dollar limit does not apply to amounts in the IRA that are attributable to rollover contributions, and any earnings thereon, . . .").

19

statutes which have given us ERISA, Keogh plans and IRAs. We believe it reasonable to conclude that Congress intended to provide protection against the claims of creditors for a person's interest in pension plans, unless vulnerable to challenge as fraudulent conveyances or voidable preferences.

*Velis v. Kardanis*, 949 F.2d 78, 82 (3d Cir. 1991). Judge Kendig cited this policy[27] in a decision involving Chapter 13: "Congress elevated the public policy in favor of retirement savings above the bankruptcy policy that favors maximum repayment to unsecured creditors." *In re Sibila*, 2010 WL 4365741, at *5, 2010 Bankr. LEXIS 3843 at *15 (Bankr. N.D. Ohio Oct. 28, 2010); *See also*, *In re Egan*, 458 B.R. 836, 849 (Bankr. E.D. Pa. 2011)(citing cases); *In re Yuhas*, 186 B.R. 381, 387 (Bankr. D.N.J. 1995), *aff'd*, *Orr v. Yuhas (In re Yuhas)*, 104 F.3d 612 (3rd Cir. 1997).

### 4.      Ability To Pay Is Not A Primary Consideration Under §707(a).

Huntington cites the amount of exempt property in this case as part of an argument for dismissal based on the Debtors' ability to pay. The *Zick* decision quoted from Collier: "Both the House and Senate Reports state[, however,] that: 'The section does not contemplate . . . that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. . . .'" *In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1991); *see also*, *In re Mohr*, 425 B.R. 457, 466 (Bankr. S.D. Ohio 2010)("While ability to pay is the primary focus for dismissal under §707(b)'s abuse test, legislative history suggests that Congress did not intend ability to pay to be a primary consideration under §707(a).").

### 5.      Whether Debtors Are Permitted To Make A "Business Decision".

In Huntington's Motion To Dismiss Pursuant To 11 U.S.C. §707(a), the bank emphasizes that Debtors made a unilateral business decision to stop paying the its loan, instead of using exempt assets to continue payments. [Doc. #40, ¶¶ 4, 5, 17]. In contrast, the Debtors point to the change in their financial circumstances with Mrs. McVicker's retirement, and the fact that Huntington elected not to respond to their efforts to discuss the debt until there was a default.

The fact that bankruptcy offers advantages to a debtor is not, standing alone, a basis for finding bad faith. *See*, *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992)("It is not bad faith to seek to gain

---

[27]/ It should be noted that there is significant disagreement about how much (if any) a debtor can voluntarily contribute toward retirement savings while repaying creditors under a bankruptcy plan. *See*, *Seafort v. Burden (In re Seafort)*, 669 F.3d 662, 674 n.7 (6th Cir. 2012). In contrast, there is very little disagreement about the protections afforded long-standing retirement accounts in bankruptcy.

an advantage from declaring bankruptcy – why else would one declare it?"); *In re Blok*, 2011 WL 4344594 at *3, 2011 Bankr. LEXIS 3526 at *8 (Bankr. S.D. Ind. Sept. 15, 2011)("As other courts have noted, debtors merely taking advantage of their legal rights is not, by itself, sufficient to support a finding of bad faith."), *aff'd*, *First Capital Bank of Ky. v. Blok*, 2012 WL 1682042, 2012 U.S. Dist. LEXIS 66963 (S.D. Ind. May 14, 2012); *In re Bingham*, 68 B.R. 933 (Bankr. M.D. Pa. 1987)(filing on eve of effective date of amendment rendering debt nondischargeable is not bad faith).[28]

A review of the case law reflects that while having an economic motive for filing bankruptcy is not a basis for dismissal under §707(a), two appellate courts have affirmed dismissals under §707(a) based upon the presence of <u>non-economic</u> motives in filing for bankruptcy. *Krueger v. Torres (In re Krueger)*, 2016 WL 232014 at *6 & *9, 2016 U.S. App. LEXIS 872 at **14-15 & *23 (5th Cir. Jan. 19, 2016)(citing *Huckfeldt*); *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832-833 (8th Cir. 1994)(non-economic motive of frustrating a divorce decree were unworthy of bankruptcy protection).

Here, the loan in issue was a commercial loan, made for a business purpose. There is no reason to think that Huntington relied on some special type of promise greater than the obligations associated with a business contract.

While the court has not addressed a case where a debtor's "business decision" was in issue, the question has arisen in connection with the actions of a creditor. In that case, a state court receiver had turned over almost $700,000 in settlement proceeds from a malpractice lawsuit to a bank, even though the bank did not have a security interest in the lawsuit or its proceeds. When the bank was asked to turnover the funds to the trustee, rather than doing what might be considered the "right thing", the bank made a business decision to assert its legal rights, and argued it should be able to keep the money. Specifically, the bank argued that it was not an "insider" for preference purposes, even though the bank had asked for the appointment of the individual selected as receiver, and that individual had allegedly ignored the limits placed on the receiver by the state court in paying over the settlement funds to the bank.

Following case law holding that a "banking relationship generally permits a bank to act in its own interests, as a creditor", this court allowed the bank to keep the monies that were, for purposes of the decision, assumed to have been wrongfully transferred to the bank. *See*, *Graham v. Huntington Nat'l Bank (In re Medcorp, Inc.)*, 521 B.R. 259, 275 (Bankr. N.D. Ohio 2014). Similarly, where debtors have simply

---

[28]/ The *Bingham* decision was cited twice in *Zick*, although not for this proposition.

made a decision to "act in their own interests", without any showing of manipulation or over-reaching, the fact that a business decision was made fails to prove that this is an "egregious" case.

**6.      The Failure To Turn Over Rent Proceeds To Huntington.**

One of the allegations that Huntington uses to support the Motion to Dismiss under §707(a) is the Debtors' failure to turn over the rents received from the units that are leased.  This is probably the strongest fact presented in support of dismissal by Huntington.   It is undermined by two countervailing considerations: 1) some evidence that the rent monies may have been used for paying expenses associated with the Stitt Street properties; and 2) the fact that Section 523(a)(6) appears to provide a more specific remedy for conversion of the rents in derogation of Huntington's security interest, if in fact there has been a conversion of the rents.

This court does not follow the line of decisions, like *Padilla*, holding that the existence of more narrow potential causes of action against a debtor (like §523(a)(6)) prohibits dismissal under the more general provision of §707(a).  *See*, *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1191-1194 (9th Cir. 2000).  *Padilla* and *Zick* are, in some ways, at opposite ends of the broad spectrum of case law interpreting §707(a).

This does not mean that the viewpoint in *Padilla*, which focuses on the existence of more specific remedies, cannot be part of *Zick*-based analysis.  *See*, *In re Bage*, 2014 WL 4749072 at *3, 2014 Bankr. LEXIS 4069 at *9-11 (Bankr. N.D. Ohio Sept. 24, 2014).  In determining whether a Chapter 7 fact situation presents an "egregious case", courts should be permitted to consider whether other remedies, other than dismissal for a lack of good faith, are available to creditors.  Here, an adversary proceeding (if Huntington elects to file one) would have the additional advantage of allowing a fuller exploration of the underlying facts, most of which were only touched on in the depositions of the McVickers attached as exhibits to Huntington's Motion.

**7.      The Smell Test.**

For the reasons stated above, the actions of the Debtors in this case, when viewed as a whole or viewed in isolation, are not contrary to the purposes of the Bankruptcy Code.  There were no prior bankruptcies, no evidence of either legal or financial manipulation, no transfers, no material misrepresentation or omissions in the schedules, neither Debtor is employed, they are not paying anyone else's expenses, the Debtors' lifestyle was (and is) not lavish, there is no "persistent pattern" of evading a

22

single creditor - instead there is a history of years of payments before making the "business decision" to default.

Congress, and in this case the Ohio legislature, have made certain policy choices which elevate the protection of debtor's exempt property over the interests of creditors in being paid. Asserting those rights, without more, does not "undermine the integrity of the bankruptcy system." *In re McFadden*, 477 B.R. 686, 693 (Bankr. N.D. Ohio 2012); *In re Bage*, 2014 WL 4749072 at *3, 2014 Bankr. LEXIS 4069 at *9 (Bankr. N.D. Ohio Sept. 24, 2014). In short, this is not an "egregious case" under *Zick*.

Therefore, for the reasons stated above,

**IT IS ORDERED** that Huntington's Motion to Dismiss Case Pursuant to 11 U.S.C. §707(a) is Denied.

###